# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Pamela Ringgold, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | |
| v. | |
| EssilorLuxottica S.A., Luxottica Group, S.p.A., Essilor International SAS, EssilorLuxottica USA Inc., Luxottica U.S. Holdings Corp., Essilor of America Holding Company, Inc., Luxottica of America, Inc., Essilor of America Inc., EyeMed Vision Care, LLC, Essilor Laboratories of America, Inc., and Vision Source, LP | **COMPLAINT** <br><br> Jury Trial Demanded |
| Defendants. | |

Plaintiff Pamela Ringgold, individually and on behalf of all others similarly situated, brings her claims against defendants EssilorLuxottica S.A., Luxottica Group, S.p.A., Essilor International SAS, EssilorLuxottica USA Inc., Luxottica U.S. Holdings Corp., Essilor of America Holding Company, Inc., Luxottica of America, Inc., Essilor of America Inc., EyeMed Vision Care LLC, Essilor Laboratories of

America, Inc., and Vision Source, LP (collectively "EssilorLuxottica" or "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.  Acting in concert, Defendants and their co-conspirators conspired to raise, fix, and stabilize the prices charged for Eyewear. Defendants did so by forming a scheme to create an illegal monopoly and to dominate the Eyewear market in the United States (the "Scheme"). Defendants accomplished this through the below described acts. The Scheme continues today. Moreover, Defendants have entered into unlawful agreements to fix the price of Eyewear at supra-competitive rates. As a result of the Scheme and Defendants' unlawful agreements, patients and individuals in the United States have been overcharged by Defendants and Defendants have obtained hundreds of millions of dollars in supra-competitive, illegal profits.

2.  This is an action brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26 for injunctive relief and under certain state antitrust and consumer protection statutes based on EssilorLuxottica's anticompetitive conduct to remedy the harm this conduct has inflicted on hundreds of thousands, if not millions, of consumers.

3. EssilorLuxottica is the world's largest eyewear conglomerate. It describes itself as the "biggest in the industry" with a "united market structure" whose "scale disparity has increased further."[1]

4. EssilorLuxottica has monopoly power in the market for Eyewear and it controls most Corrective Lens processing and Corrective Lens fabricating equipment. EssilorLuxottica acquired its monopoly through a systematic program of acquiring its rivals and using its dominant market position and its control of retailers and Corrective Lens processing to create barriers to foreclose competition in the Eyewear Market.

5. As a direct and proximate result of Defendants' unlawful and anticompetitive Scheme and Defendants' anticompetitive practices, Plaintiff and the members of the Classes (defined below) have paid higher prices for Eyewear than they would have paid in a competitive marketplace absent the Scheme and the anticompetitive practices, and have thereby suffered, and continue to suffer, antitrust injury.

---

[1] *See* EssilorLuxottica Capital Market Day 2022, available at https://www.essilorluxottica.com/en/cap/content/101694/ (last visited Jan. 16, 2024).

3

**JURISDICTION AND VENUE**

6.   Pursuant to 28 U.S.C. §§ 1331, 1332(d), 1337, and 1367, this Court has subject matter jurisdiction because this action arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and under the Clayton Antitrust Act, 15 U.S.C. § 26, Section 16.

7.   Under Section 12 of the Clayton Act, 15 U.S.C. § 22, this Court has personal jurisdiction over Defendants because each Defendant: (a) transacted business in the United States, including in this District; (b) manufactured, sold, shipped, or delivered substantial amounts of product in the United States, including this District; (c) had substantial contacts with the United States, including in this District; or (d) engaged in anticompetitive conduct that had a direct, foreseeable, and intended effect of injuring the business or property of persons residing in, located in, or doing business in the United States, including in this District. Moreover, Defendants purposefully directed their business activities toward, and had substantial contacts with, this jurisdiction.

8.   Venue is appropriate in this District under 28 U.S.C. § 1391 because, at all relevant times, Defendants transacted business in this District, and the interstate

trade and commerce described herein was and is carried out, in substantial part, in this District.

9.   Defendants engaged in interstate commerce in the United States, including, but not limited to, Minnesota through the sale of their eyewear and that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects on interstate commerce in the United States.

10. Defendants' activities were within the flow of and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

11. By reason of the unlawful activities herein alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states, to obtain and maintain monopolistic power in the Relevant Market and charge supra-competitive prices to Plaintiff and the Class for Eyewear, unreasonably restrained trade, and adversely affected the herein described markets.

## PARTIES

12. Plaintiff Pamela Ringgold, is a citizen and resident of New York and resides in Hempstead, New York. Plaintiff purchased Ray-Ban frames and, on information and belief, Essilor branded lenses, from Davis Visionworks located in Garden City, New York in October 2021.

13. Plaintiff brings this action individually and on behalf of all other similarly situated consumers of Defendants' Eyewear[2] in the United States.

14. Defendant EssilorLuxottica S.A. is a French joint stock company, with a registered office at 147 rue de Paris 94220, Charenton-Le-Pont, France. It was formed after a 2018 merger between Luxottica Group S.p.A. and Essilor International SAS.

15. Defendant Luxottica Group, S.p.A. is an Italian corporation with its principal place of business at Piazzale Luigi Cadorna 3, 20123 Milan, Italy, and maintains an office in the United States at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica Group, S.p.A. owns defendant Luxottica U.S. Holdings Corp. and Glasses.com. Additionally, Luxottica Group, S.p.A. owns Oakley, Inc., Alain Mikli,

---

[2] Eyewear refers to eyeglass frames, corrective lenses, sunglasses, and eyeglasses (including frames and corrective lenses).

6

Oliver Peoples, Sferoflex, Arnette, Ray-Ban, Persol, Vogue Eyewear, Starck Biotech Paris, and maintains exclusive licenses for many of the Fashion House Brands. Such licensing agreements may also be held by EssilorLuxottica S.A.

16. On information and belief, Essilor International SAS is a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France. Essilor International SAS owns defendant Essilor of America Holding Company, Inc. and Costa Del Mar, Inc.

17. Defendant EssilorLuxottica USA Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. EssilorLuxottica USA Inc. is a holding company for EssilorLuxottica S.A.'s North American business activities.

18. Defendant Luxottica U.S. Holdings Corp. is a Delaware corporation with its principal place of business at 44 Harbor Park Drive, Port Washington, New York 11050. Luxottica U.S. Holdings Corp. owns defendant Luxottica of America, Inc.

19. Defendant Essilor of America Holding Company, Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. Essilor of America Holding Company, Inc. owns defendant Essilor of America Inc.

20. Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica of America, Inc. owns the eyewear retailers LensCrafters, Pearle Vision, Target Optical, and Sunglass Hut. Luxottica of America, Inc. also owns defendant EyeMed Vision Care, LLC.

21. Defendant Essilor of America Inc. is a Delaware corporation with its principal place of business at 13555 North Stemmons Fwy, Dallas, Texas 75234. On information and belief, Essilor of America Inc. owns defendant Vision Source, LP and Frames for America, Inc.

22. Defendant EyeMed Vision Care, LLC is a Delaware limited liability company with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. EyeMed Vision Care, LLC is wholly owned by defendant Luxottica of America, Inc.

23. Defendant Essilor Laboratories of America, Inc. is a North Carolina corporation and subsidiary of Essilor of America, Inc. that is headquartered at 13555 North Stemmons Freeway, Dallas, Texas 75234. Essilor Laboratories of America, Inc. manufactures optical supplies, specifically, ophthalmic lenses for various prescriptions, frames, and sunglasses.

24. Defendant Vision Source, LP is a limited partnership formed under the laws of Texas that is headquartered at 23824 Highway 59 North, Kingwood, Texas 77339. Vision Source, LP is a wholly owned by defendant Essilor International SAS.

25. EssilorLuxottica wholly owns or maintains direct control over the following direct-to-consumer retail outlets, Oakley stores, Ray-Ban stores, Sunglass Hut, Pearle Vision, LensCrafters, Target Optical, Oliver Peoples stores, Frames for America, For Eyes stores, Vision Source, Grand Vision, eyebuydirect.com oliverpeoples.com, glasses.com, framesdirect.com, ray-ban.com, Oakley.com, sunglasshut.com, lenscrafters.com, targetoptical.com, pearlvision.com, costadelmar.com, persol.com, vogue-eyewear.com, arnette.com, and visionsource.com, and are thus fully integrated and consolidated into EssilorLuxottica.

26. For corrective lenses, EssilorLuxottica owns or maintains control over the following brands and manufacturers, Essilor, Varilux by Essilor, Eyezen by Essilor, Stellest by Essilor, Crizal by Essilor, Xperio by Essilor, Barberini, KODAK Lens, Nikon, Oakley, Ray-Ban, Shamir, and Transitions.

## AGENTS AND CO-CONSPIRATORS

27. The anticompetitive and unlawful acts alleged against Defendants in this Complaint were authorized, ordered, and/or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of Defendants' business or affairs.

28. The officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals. Alternatively, the agents acted within the scope of their explicit and apparent authority, binding their respective principals.

29. Each Defendant, and its respective subsidiaries, affiliates and agents operated as a single unified entity.

30. Defendants conspired with Fashion Houses, other Competing Eyewear Entities, and Third-Party Sellers to fix prices through long-term exclusive licensing agreements and distribution agreements. Through these agreements, the parties were able to fix prices at supra-competitive levels and set the price floor, effectively eliminating competition. Various persons, businesses, and/or entities that are not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have

facilitated, adhered to, participated in, aided and abetted, and otherwise acted in

concert with Defendants in connection with EssilorLuxottica's monopolization of

Branded Eyewear. Plaintiff reserves the right to name some or all of these entities

as Defendants.

RELEVANT MARKET

31. The relevant product market is the market for Branded Eyewear, including

frames, corrective lenses, eyeglasses (consisting of corrective lenses and frames),

and sunglasses. This market is for Branded Eyewear, or higher-end, brand

prescription and non-prescription eyeglass frames, corrective lenses, and

sunglasses sold to consumers in the United States. This market is hereinafter

described as the "Branded Eyewear Market."

32. The Branded Eyewear Market distinguishes itself from the non-branded

eyewear market because it is meant to be high-end and desirable. EssilorLuxottica

describes the products as "desirable fashion accessories that enable self-expression

and enhance self-confidence[],"[3] as opposed to solely being a functional purchase

that eyewear was seen as previously.

---

[3] Eyewear, EssilorLuxottica (last visited Jan. 16, 2024), https://www.essilorluxottica.com/en/brands/eyewear/.

33. The Branded Eyewear Market differs from the mass consumer eyewear market as the mass consumer eyewear market focuses on providing consumers with eyewear in a budget friendly manner, rather than the desirability of the accessory.

34. Due to the differences in the two markets, Branded Eyewear manufacturers compare their pricing to other Branded Eyewear Brands to set pricing, rather than to manufacturers of mass consumer eyewear. Because of this, Branded Eyewear is typically hundreds of dollars more than mass consumer, non-branded eyewear. Because of the separation from mass consumerism, consumers of Branded Eyewear are not in the market for mass consumer eyewear and are unlikely to switch.

35. The Branded Eyewear Market does not include contact lenses because contact lenses are not a reasonably interchangeable substitute for eyeglasses, sunglasses, or corrective lenses for eyeglasses and sunglasses. Consumers do not and would not switch from eyeglasses or sunglasses to contact lenses because of a small but significant increase in price. There are a number of reasons for this difference including consumer preference, health reasons that may prevent a

consumer from wearing contacts, functionality of contacts v. eyeglasses or sunglasses, etc.

36. The Branded Eyewear Market does not include corrective vision surgery, such as LASIK. Consumers would not switch from eyeglasses or sunglasses to having surgery because of a small but significant increase in price. For example, corrective vision surgery does not reduce brightness, some consumers may not wish to undergo surgery, some consumers may not be eligible for surgery for medical reasons, and some consumers wear Eyewear as a fashion statement.

37. The relevant geographic market for the Branded Eyewear Market is the United States. Consumers nationwide obtain Eyewear and Defendants distribute and sell their Eyewear throughout the United States in nationwide networks of brick-and-mortar stores and online through retail channels.

## MARKET POWER

38. The conduct alleged herein affected billions of dollars of commerce during the relevant period.

39. During the relevant period, Defendants had and have market power in the Branded Eyewear Market. On information and belief, EssilorLuxottica owns or controls 80% of the major brands in the global eyewear industry.

40. On information and belief, EssilorLuxottica owns or controls approximately 70% of the Corrective Lenses Market.

## CLASS ALLEGATIONS

41. Plaintiff brings this action individually and on behalf of all others similarly situated under Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2), as representative of a Class of indirect purchasers seeking injunctive relief ("Injunctive Relief Class") defined as follows:

> Any person in the United States who indirectly purchased Eyewear of any of EssilorLuxottica's Proprietary Brands, Fashion House Licensed Brands, and the brands of Competing Eyewear Entities, as those brands are defined in the Complaint.[4]

42. Plaintiff brings this action individually and on behalf of all others similarly situated under Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of a Class seeking damages for violations of various state antitrust and consumer protection laws ("State Law Class"), defined as:

> Any person in the United States who indirectly purchased Eyewear of any of EssilorLuxottica's Proprietary Brands, Fashion House Licensed Brands, and the brands of Competing Eyewear Entities, as those brands are defined in the Complaint, in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the District of

---

[4] For purposes of defining the Class Period for both Classes, discovery will reveal when the unlawful conduct occurred, and the Class Period will end on the date of class certification.

Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. [5]

43. The Classes are so numerous that joinder of all members would be impracticable. While the exact number of Class members is unknown, given the commerce at issue and Defendants' significant market share, there are likely millions of Class members.

44. Plaintiff's claims are typical of those of the Classes.

45. Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiff are in accordance with those of the Classes.

46. Questions of law and fact common to the members of the Classes will prevail over questions, should they arise, that may be individual to individual class members because Defendants have acted on grounds generally applicable to the class.

---

[5] Direct purchases from any wholly owned Defendant are excluded from the proposed Classes. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; defendants' attorneys in this case, federal government entities and instrumentalities, states or their subdivisions, and all judges assigned to this case.

47. Questions of law and fact common to the Classes include, but are not limited to:

a) Whether the United States Branded Eyewear Market constitutes a Relevant Market;

b) Whether EssilorLuxottica possesses monopoly power in the Relevant Market;

c) Whether the relevant geographic market is the United States;

d) Whether Defendants engaged in a conspiracy in violation of the antitrust laws;

e) Whether EssilorLuxottica monopolized, conspired to monopolize, or attempted to monopolize the Branded Eyewear Market;

f) Whether Defendants engaged in unfair methods of competition, and unfair and deceptive acts, in violation of state consumer protection laws;

g) Whether EssilorLuxottica engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the Branded Eyewear Market and thereby foreclosed substantial competition in that market;

h) Whether EssilorLuxottica's Exclusive Licensing Agreements constitute anticompetitive conduct intended to maintain the Defendants' monopoly in the Branded Eyewear Market;

i) Whether EssilorLuxottica's Exclusive Licensing Agreements, sales agreements, and distribution agreements constitute a conspiracy to monopolize the Branded Eyewear Market;

j) Whether EssilorLuxottica's Exclusive Licensing Agreements and sales agreements constitute a conspiracy or collusion to fix, raise, maintain, or stabilize the retail price of its Proprietary Brands, Licensed Fashion House

Brands, and the brands of Branded Eyewear Competitors or otherwise restrain trade in the United States;

k)  Whether EssilorLuxottica's conduct caused Plaintiff and members of the Class to pay supra-competitive prices for Eyewear and thereby suffer antitrust injuries;

l)   The appropriate declaratory and injunctive relief for the Class; and

m) The measure of damages sustained by Plaintiff and the Class.

**FACTUAL ALLEGATIONS**

**I.   Background**

**A. About Eyewear**

48. In 1268, Roger Bacon made the first lens for optical purposes.[6]

49. The first eyeglasses in Europe were found in Italy in as early as 1352.

50. Later, the first lenses for nearsightedness, or the inability to see far away, were seen in 1517. Benajmin Franklin invented bifocals in 1784.[7]

51. Eyewear is made of two main components, a frame and typically two corrective lenses. Sunglasses are similarly made of two main components, including a frame and lenses. The lenses, unlike corrective eyewear, are designed

---

[6]   Eyeglasses, Britannica (last visited Jan. 23, 2024), https://www.britannica.com/science/eyeglasses.

[7] *Id*.

to block the sun. Alternatively, like eyewear, the lenses can also be corrective, i.e. prescription.

52. The first component, the frame, can be manufactured with various substances, but a frame is most often manufactured from metal or plastic.[8] A metal frame can be made of one type of metal, such as titanium, or an alloy, a mix of different metals. A plastic frame is typically lighter weight compared to a metal frame and might be less expensive. In the United States, regardless of the material, an eyeglass frame is typically very inexpensive to manufacture, often costing less than $2.50 per frame.

53. The second component of eyewear, lenses, are added to the frame. Lenses can be prescription, to correct vision problems, including near or far sightedness, both, or astigmatism, among other things. Lenses can also be inserted into frames for non-corrective purposes, such as to block out the sun or blue light.

---

[8] *See, e.g.*, How to Choose the Glasses Frame Material That is Right For You, https://www.aao.org/eye-health/glasses-contacts/eyeglass-frame-materials   (last visited Jan. 21, 2024).

54. Historically, lenses were made of rock, typically transparent quartz or beryl. Later, lenses were made from glass that was manufactured in Europe, typically Venice or Nurenberg.[9]

55. Today, most lenses are manufactured from plastic, not glass.

56. Modern day lenses are typically manufactured in Asia, often in China, Singapore, Japan, and/or Korea.

57. After the lenses are manufactured, they are shipped to the United States. The next steps, as further described below, include fabricating and edging (also known as processing).

## B. Eyecare Professionals

58. In the United States, individuals are likely to encounter one of the three "O's" (ophthalmologist, optometrist, optician) when obtaining prescription eyewear.

59. An ophthalmologist is a medical doctor who has completed 12-14 years of specialized training.[10] An ophthalmologist is trained to treat underlying eye

---

[9] *Supra* note 6.

[10]    *See*,    *e.g.*,    https://www.aao.org/eye-health/tips-prevention/what-is-ophthalmologist (last visited Jan. 21, 2024).

conditions in addition to conducting vision screenings and prescribing corrective lenses.

60. An optometrist provides primary vision care, including vision testing. An optometrist is not a medical doctor but has certain college education and an additional four-year degree from an optometry school. As described by the American Academy of Ophthalmologists, an optometrist is "licensed to practice optometry, which primarily involves performing eye exams and vision tests, prescribing and dispensing corrective lenses, detecting certain eye abnormalities, and prescribing medications for certain eye diseases in some states."[11]

61. An optician is a technician "trained to design, verify and fit eyeglass lenses and frames, contact lenses, and other devices to correct eyesight." They do not prescribe corrective lenses and do not perform vision tests. [12]

62. To obtain corrective lenses, an individual typically needs a prescription that will ensure the corrective lenses are tailored to the individual's eye needs. The prescription is the result of a visual examination of the eyes by either an optometrist or an ophthalmologist.

---

[11] *Id.*

[12] *Id.*

63. Traditionally, in the United States, when someone needed eyeglasses, they would see an ophthalmologist or optometrist to obtain a prescription. With that prescription, the patient typically filled it by obtaining eyeglasses at the doctor's office or through an optician. Today, many prescriptions are filled online. Thus, corrective lenses may be dispensed in person, also known as brick and mortar, or over the internet.

64. Any of the "three O's" may be affiliated with a particular brand or insurance provider. For example, an optometrist may work for Pearle Vision, one of the brands owned by EssilorLuxottica. Alternatively, optometrists and ophthalmologist might be "independent." By this, that typically means the eyecare provider is not affiliated with a particular brand but might be working with a specific insurance provider. For many of these independent providers, as further set forth herein, EssilorLuxottica provides various benefits and incentives to ensure they, like EssilorLuxottica's branded stores, such as Pearle Vision, Target Optical, and LensCrafters, prescribe and dispense EssilorLuxottica branded and/or licensed products.

21

### C. The United States Food and Drug Administration's Regulation of Sunglasses and Corrective Eyewear

65. In the United States, the Food and Drug Administration ("FDA") has jurisdiction over the federal regulation of medical devices that are either made or sold in the United States. Both eyeglass frames and corrective lenses are medical devices and must adhere to a number of United States regulatory requirements.[13] Moreover, the completed prescription eyeglasses, containing both the frames and corrective lenses, are also medical devices that are regulated by the FDA.

66. Among other things, any United States manufacturer must register with the FDA and comply with all relevant regulations. The FDA provides that a "manufacturer" within the meaning of these regulations also includes "an importer for resale." 21 C.F.R. 810.410(g). Thus, by importing lenses into the United States, the importer who intends to resell the lenses must also ensure they comply with these FDA regulations.

---

[13] Sunglasses, Spectacle Frames, Spectacle Lens and Magnifying Spectacles, available at https://www.fda.gov/medical-devices/guidance-documents-medical-devices-and-radiation-emitting-products/sunglasses-spectacle-frames-spectacle-lens-and-magnifying-spectacles (last visited Jan. 16, 2024).

67. Eyeglasses and sunglasses must also be registered with the FDA and meet certain quality control standards. [14]

68. For example, lenses must be certified to be impact resistant.[15]

69. Lenses that are not certified as impact resistant and any frames that are not appropriately registered with the FDA may be denied entry into the United States or detained at the port of entry by the United States.[16]

### D. Corrective Lens Processing

70. The FDA describes two categories of lenses, finished or semi-finished.[17]

71. The first category, finished, refers to lenses that are already shaped to fit a particular prescription. Within this category of finished lenses, there are both "uncut finished" or "finished form."[18] An uncut finished lens, also known as a "stock" lens is one that has been shaped to fit a specific prescription but has not

---

[14] *Id.*

[15] 21 C.F.R. § 801.410.

[16] *Supra,* note 13.

[17] *See, e.g.,* FDA Guidance for Industry and FDA Staff, Impact-Resistant Lenses: Questions and Answers, issued on Sept. 2, 2010, available at https://www.fda.gov/media/71020/download (last visited Jan. 16, 2024).

[18] *Id.; see also* 21 C.F.R. 801.410(c)(3).

yet been cut to fit a specific frame. The "finished form" is a final lens that has been both shaped to fit a specific prescription and cut to fit a specific frame. Finished lenses are for single vision, or for a single prescription. Thus, they are not suitable for progressive or multi-vision lenses.

72. The second type of lens is semi-finished, also known as surfaced, lenses. These are lenses that are finished on one side.

73. Semi-finished lenses and uncut finished lenses need further processing before they can be inserted into a frame, but the exact processing required will vary based on the lens category. For the former category, semi-finished, the below steps represent the typical processing for these types of lenses in a processing facility.

74. Semi-finished lenses, as shown below, typically begin as 'pucks' or 'lens blanks.'[19] The blanks are typically manufactured outside of the United States then shipped to the United States for processing.



---

[19] *Id.*

75. Pucks typically have the front surface completed or finished, but the inside surface, i.e. the part through which the wearer will look, must be manufactured to match the patient's prescription. The puck will be resurfaced to the exact prescription ordered.

76. To process semi-finished lenses, the following steps typically apply.

77. First, as described by Essilor, is ordering and logistics.[20] In this step, the individual prescription and specific order is sent to the processing lab. The order is "trayed up," – where the processing lab takes the unique prescription, pulls the relevant lens blanks, the frame (if the lenses will also be edged and placed into the frame), and typically assigns the tray, or the order, a barcode to follow the lenses through the manufacturing process.[21]

---

[20] *See* How lenses are made @ Essilor, June 30, 2017, available at https://www.youtube.com/watch?v=3OEaQgIxV0M (last visited Jan. 16, 2014).

[21] *See, e.g.*, How a P.E.I. optical company turns a glass 'hockey puck' into eyewear, available at https://www.cbc.ca/news/canada/prince-edward-island/vogue-optical-lenses-1.4544919 (last visited Jan. 12, 2024).

25

78. The second step is "filming" or "taping." In this step, a worker places a protective film on the front surface of the lens so that it is not damaged during processing.[22]

79. The third step is "blocking." In this step, a metal attachment is placed on the lens so that the lens can be placed on a machine to then grind the side of the lens.

80. In the fourth step, "surfacing," a machine grinds down the inside of the lens to shape it to a specific prescription.

81. Fifth, "polishing." In this step, the lens is polished to remove excess material and create a smooth, round disc.

82. Next, the tape is removed, and the block is removed, known as deblocking. The lens is also rinsed and cleaned.

83. If the customer orders any special coatings or films, those are then applied to the lens.

84. Finally, the lens is complete and ready to be placed into a frame.

85. At this stage, known as edging or fitting, the fully finished lens is placed into the frame. This process can be completed by the processing lab or at the optical

---

[22] *See* How It's Made – Eyeglass Lenses, available at https://www.youtube.com/watch?v=xfhjWyAU9Cw (last visited Jan. 12, 2024).

professional's office. To place the fully finished lenses into a frame, the frame is measured, then a specialized machine edges, or cuts, the lenses to fit into the frame. As further described below, Essilor is the leading processor of lenses in the United States and also manufacturers equipment used to process lenses, as well as edge or fit lenses.

## II.   EssilorLuxottica

### A. Essilor

86. Essilor was established in 1849 in Paris, France. Essilor initially manufactured eyewear frames as Société des Lunetiers, or SL. Eventually, in 1861, SL entered the lens manufacturing world, hoping to dominate the industry in Paris.

87. The company eventually expanded into a global market and in 1962, SL changed its name to ESSEL. ESSEL frequently partnered with the Lissac Group, which was comprised of two parts, SIL and LOR.

88. In 1969, SIL and LOR merged to become SILOR. Later, ESSEL would merge with SILOR, creating the Essilor Group.[23]

---

[23] Autumn Sprabary, EssilorLuxottica: The visionary marriage of two industry pioneers, All About Vision, (Aug. 11, 2021), https://www.allaboutvision.com/eyewear/essilor-luxottica-frames-eyewear-

**B. Luxottica**

89. Luxottica was founded in 1961 by Leonardo Del Vecchio in Agordo, Italy.[24] At its inception, the company only produced eyewear components, but Del Vecchio had his sights set on dominating the eyewear market.[25] Shortly after the company's creation, it started doing just that. After experiencing success in the production of their eyeglass frame, Luxottica launched into an acquisition and expansion phase that continues to this day.

90. Beginning in 1974 and continuing through the present, Luxottica, now EssilorLuxottica, vertically and horizontally integrated, acquiring wholesalers, retailers, and brands. These acquisitions are in addition to the Exclusive Licensing Agreements that the company has entered into with a multitude of Fashion House Brands.

---

brands/#:~:text=Essilor%20was%20first%20established%20in,leading%20lens%20manufacturer%20in%20Paris.

[24] A Fascinating History, An Unstoppable Journey: A Future to be Built Day by Day, Luxottica, 2 (Dec. 1, 2023), https://www.luxottica.com/sites/luxottica.com/modules/tt_luxhistory/pdf/Luxottica_History_ENG_WEB_5.pdf.

[25] *Id.*

91. Luxottica's expansion began with the company's acquisition of Scarrone S.p.a, an eyewear wholesaler, and continued with Luxottica acquiring most of its competition, including Avant-Garde Optics Inc., Vogue Eyewear, Persol, LensCrafters, Ray-Ban, Sunglass Hut, OPSM, Pearle Vision, Target Optical, Sears Optical, Oakley, Glasses.com, and a number of foreign eyewear companies.[26]

### C. EssilorLuxottica Merger

92. In 2018 Luxottica merged with Essilor to create the eyewear conglomerate, EssilorLuxottica.[27]

93. With this merger, EssilorLuxottica became a behemoth in both the lens and the frame markets.

94. In addition to the control that EssilorLuxottica maintains over the manufacture and sale of eyewear, the company also expanded its reach into luxury eyewear. EssilorLuxottica obtained this control by entering into Exclusive Licensing Agreements with luxury brands, otherwise known as Fashion House

---

[26] *Id* at 21.

[27] Essilor and Delfin successfully complete the combination of Essilor and Luxottica by creating EssilorLuxottica, a global leader in the eyecare and eyewear industry, EssilorLuxottica, (Sept. 30, 2018), https://www.essilorluxottica.com/en/newsroom/press-releases/essilor-and-luxottica-combination/.

Brands. Such brands include, but are not limited to, Swarovski[28], Ferrari[29], Giorgio Armani, Brooks Brothers, Bulgari, Chanel, Prada, Versace, Donna Karan, Dolce & Gabbana, Burberry, Ralph Lauren, Tiffany, Tory Burch, Coach, Michael Kors, and Valentino.[30]

95. The Exclusive Licensing Agreements that EssilorLuxottica has entered into with the numerous Fashion House Brands have allowed and still allow the company to be the sole eyewear producer for the various Fashion House Brands.

96. The company's continued expansion has allowed EssilorLuxottica to become a vertically integrated, multi-national eyewear designer, manufacturer, distributor, and retailer.

97. Throughout Luxottica's and eventually EssilorLuxottica's decades long domination of every aspect of the eyewear market, the company has acquired

---

[28] Swarovski and EssilorLuxottica announce a ten-year licensing agreement, EssilorLuxottica, (Dec. 6, 2022), https://www.essilorluxottica.com/en/newsroom/press-releases/swarovski-and-essilorluxottica-license-agreement/.

[29] EssilorLuxottica extends its partnership with Ferrari, new license agreement for Prancing Horse brand, EssilorLuxottica, (Dec. 14, 2022), https://www.essilorluxottica.com/en/newsroom/press-releases/license-agreement-with-ferrari/.

[30] *Supra* note 25.

numerous retail outlets, eyewear producers, and wholesalers as well as contracting with some of the largest Fashion House Brands in the world to produce their eyewear.[31]

98. EssilorLuxottica's acquisitions have allowed it to become a behemoth in the eyewear industry, controlling at least 80 percent of the global eyewear market.[32]

99. Because EssilorLuxottica produces most of the eyewear on the market in addition to owning and operating the majority of eyewear retailers, consumers have few alternatives to EssilorLuxottica. Given the lack of competition, EssilorLuxottica can set supra-competitive prices, and consumers have no option but to pay them.

100.    EssilorLuxottica's Exclusive Licensing Agreements also have an anti-competitive impact on the market. Given the brands that EssilorLuxottica owns, *i.e.*, Ray Ban, Oakley, etc., Proprietary Brands, the company is in the Branded Eyewear Market. Being a player in the Branded Eyewear Market should put

---

[31] *Id.*

[32] Ana Swanson, *Meet the Four-Eyed, Eight-Tentacled Monopoly That is Making Your Glasses So Expensive*, Forbes (Sept. 10, 2014), https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/?sh=a65602a6b66b.

EssilorLuxottica in direct competition with the Fashion House Brands that they have contracted with to manufacture their eyewear. Because the parties work together rather than against one another, they have the opportunity to exercise strategic control over the prices of their eyewear, again allowing them to impose supra-competitive prices.

101.   For corrective lenses, EssilorLuxottica has similarly cornered the market and, on information and belief, today occupies at least 70% of the lens processing capacity in the United States.

102.   EssilorLuxottica's domination of all aspects of the eyewear market has created an anticompetitive environment where supra-competitive prices reign, in direct violation of the Sherman Act. This violation requires action to remedy the state of the eyewear market for millions of impacted Class members.

### D. Vertical Integration

103.   EssilorLuxottica is a vertically integrated, multinational, corporate conglomerate that designs, manufactures, distributes, and sells Eyewear, which is defined as eyeglasses, sunglasses, and corrective lenses. EssilorLuxottica also

provides vision benefits to consumers through its subsidiary, EyeMed, and partners with independent optometrists through Vision Source.

104.   As of 2014, EssilorLuxottica was the world's largest Eyewear conglomerate, owning an estimated 80% of the major Eyewear brands globally.[33] EssilorLuxottica's control of the market has expanded in the past decade since this estimate.

### i.   Frames

105.   For eyewear frames, EssilorLuxottica manufactures its own eyewear frames and, pursuant to licensing agreements as set forth herein, manufactures frames for other brands. Thus, EssilorLuxottica controls the vast majority of eyewear frame brands.

106.   EssilorLuxottica owns numerous well known and successful Eyewear brands (the "Proprietary Brands") including:

A.   1981: Sferoflex;

B.   1990: Vogue Eyewear;

C.   1995: Persol;

D.   1999: Ray-Ban and Arnette;

---

[33] *Id.*

33

E.  2007: Oakley and Oliver Peoples;

F.  2010: Foster Grant;

G.  2013: Alain Mikli, Starck Biotech Paris, and Bolon; and

H.  2014: Costa Del Mar and Native Eyewear

107.  These frames are sold through EssilorLuxottica's 200 e-commerce platforms and extensive retail network of more than 18,000 stores, including stores both owned and not owned by EssilorLuxottica.[34]

108.  Over time EssilorLuxottica has purchased numerous well-known and successful Eyewear retailers, including:

A.  1995: LensCrafters;

B.  2001: Sunglass Hut;

C.  2004: Cole National, including Pearle Vision, Sears Optical, and Target Optical;

D.  2007: Oakley Stores;

E.  2009: FramesDirect.com;

---

[34]  Who We Are, EssilorLuxottica (Dec. 12, 2023), https://www.essilorluxottica.com/en/group/.

     F.  2014: Glasses.com; and

     G.  2021: For Eyes.

109.    EssilorLuxottica also continues to manufacture Eyewear and has purchased numerous Eyewear manufacturers over the years, including:

     A.  1995: Gentex Optics;

     B.  2003: OPSM;

     C.  2008: Satisloh;

     D.  2013: Xiamen Yarui Optical Co., Ltd., d/b/a Bolon;

     E.  2014: Transitions Optical;

     F.  2018: Fuki Megan (manufacturer, 67% stake); and

     G.  2019: Barberini (manufacturer).

     **ii.    Lenses**

110.    Moreover, EssilorLuxottica has control over the corrective lens market. EssilorLuxottica describes itself as the "proprietary owners of the world's most iconic vision care and eyewear brands."

111.   EssilorLuxottica has created and owns the following lens brands[35]:

A.  Eyezen – single vision lenses

B.  Varilux – progressive lenses

C.  BlueUV Filter System

D.  Xperio

E.  Transitions

F.  Crizal

112.   Moreover, EssilorLuxottica has licensing agreements with other major brands, including:

A.  Kodak Lens[36]

B.  Nikon[37]: Essilor and Nikon's partnership began in 2000, when the companies joined forces to conduct research, development, production, and

---

[35] Discover our Brands, available at https://www.essilor.com/us-en/products/ (last visited Jan. 16, 2024).

[36]  EssilorLuxottica publicly states it has held a licensing agreement with Kodak Lens since 2010. *See* https://www.essilorluxottica.com/en/brands/eyecare/.

[37]   EssilorLuxottica   describes   this   a   "joint   venture."   *See* https://www.essilorluxottica.com/en/brands/eyecare/.

sales. In 2009, they formed a joint venture based in Japan in order to expand their research and development of optics and ophthalmic materials.[38]

113.    Similar to Luxottica, Essilor has embarked on acquiring other corrective lens companies. By way of example, EssilorLuxottica has acquired the following:

     A. Transitions Optical – 2014

     B.  Shamir – 50% control in 2010 and fully acquired in August 2022[39]

114.    Through these acquisitions, EssilorLuxottica has obtained a monopoly share of the corrective lens market.

### iii.    Vision Insurance - EyeMed

115.  In   addition   to   EssilorLuxottica's   expansive   retail   network, EssilorLuxottica maintains a network of 300,000 third-party stores, including independent opticians and distribution chains.[40]

---

[38] Nikon Corporation, Japan and Essilor International, France, establish a joint research   center   in   Japan,   Nikon   (last   visited   Jan.   23,   2024), https://www.nikon.com/company/news/2009/0212_01.html.

[39]                https://www.visionmonday.com/business/international-news/article/essilorluxottica-acquires-100-percent-of-shamir-optical. Before this full acquisition, it was reported that Essilor acquired a 50% stake in Shamir Optical in   2011   for   $130   million.   *See*   https://www.optiknow.ca/2022/08/03/reports-essilorluxottica-acquires-100-of-shamir-optics/.

[40] *Id.*

116.   EssilorLuxottica is also involved in vision benefits through its subsidiary, EyeMed.

117.   As further described herein, EyeMed is the United States's second largest vision insurance provider.

### iv.   Vision Source

118.   EssilorLuxottica owns Vision Source that contracts with "independent" eyecare professionals for the sale of EssilorLuxottica's Proprietary brands and licensed brands.

119.   Many of these eyecare professionals are part of the EssilorLuxottica corporate structure, as the eyecare professionals are members of Vision Source.

120.   Vision Source's network treats approximately 16 million patients annually, collectively making it the largest optical retailer in the United States.

### v.   EssilorPRO

121.   As EssilorLuxottica describes it, EssilorPRO is "dedicated to supporting our independent eyecare professionals with everything you need to help your

business grow. From educational programs and promotional materials to innovative patient tools and more, we're here for you."[41]

122.   Through EssilorPRO, EssilorLuxottica provides independent eyecare practitioners with various resources that are broadly designed to maximize sales of EssilorLuxottica products.

123.   For example, EssilorPRO utilizes SmartBook – "a patient relationship management system that makes it easy for eyecare professionals to focus on patient care."[42] The purpose of SmartBook is to bring in patients and to "build loyalty and encourage purchases." These purchases, of course, are designed to benefit EssilorLuxottica by encouraging eyecare professionals to steer patients to purchase EssilorLuxottica products. SmartBook is provided without charge to Vision Source, PERC, Opti-Port, and EssilorLuxottica 360 Essilor Experts.[43] As one testimonial describes, the "branded patient communications help plant the seeds

---

[41] EssilorPro (last visited Jan. 23, 2024), https://www.essilorpro.com/.

[42] SmartBook Goes Beyond Standard Online Book & Patient Engagement, EssilorPro (last visited Jan. 23, 2024), https://www.essilorpro.com/programs-services/smartbook#how.

[43]       *See*       SmartBook       brochure,       available       at https://www.essilorpro.com/content/dam/essilor-pro/smartbook/SmartBook_Brochure.pdf.

before the patient even comes in, which cuts down on the amount of time my opticians and I have to spend educating patients on the importance of premium products."[44]

124. EssilorPRO also offers "Essilor Experts," that rewards eyecare practitioners because "the more you partner with Essilor, the more benefits you unlock to help your practice grow." [45] Essilor Experts touts that Essilor Experts practices "perform better' and "2.8x Average Lens Selling Price growth."  As Essilor Experts defines it, the "Capture Rate = total lenses divided by total exams." This means, as intended, eyecare professionals who are part of the EssilorPRO program sell more Essilor branded lenses.

125.  Moreover, Essilor Experts provides a multi-tiered level of rewards for both lenses and frames. For lenses, EssilorLuxottica offers Essilor Preferred Rewards® Program.[46] This program is a "loyalty program designed to reward select practices for their business with Essilor" and has been in effect since at least

---

[44] *See id.*

[45] Join Essilor Experts, EssilorExperts (last visited Jan. 23, 2024), https://www.essilorpro.com/programs-services/essilor-experts.

[46] A New Way to Get Rewarded, Essilor (last visited Jan. 23, 2024), https://rewards.essilorusa.com/program.

April 1, 2018. Through this rewards program, eyecare professionals earn points for purchasing Essilor lens brands from participating labs. For most transactions, eyecare professionals earn 25 points per qualifying pair of lenses. Although at first glance the rewards are for gift cards, apparel, and electronics, on closer examination, the frequently asked questions reveal that the rewards are also for rebates.[47] The reward website further reveals that the eyecare practitioner can redeem 25 points for a $1 rebate and even provides an ACH authorization form for the retailer to complete. Other available gifts include a three day trip to various Fairmont properties, an ultimate NASCAR Driving Experience, Tumi luggage, and branded office gear.

126.   For frames, EssilorLuxottica offers EssilorLuxottica 360 that provides increase frame rebates of 3-5%, thus encouraging eyecare practitioners to dispense EssilorLuxottica frames.

---

[47] Essilor Preferred Rewards Program FAQ, Essilor (last visited Jan. 23, 2024), https://rewards.essilorusa.com/faq.

127.   Further, through Essilor Experts, eyecare providers have access to the "Dashboard" that, among others, helps users increase their lens average selling price by at least $23.[48]

128.   At bottom, Essilor PRO is designed to maximize EssilorLuxottica's sales by incentivizing independent eyecare providers to prescribe and dispense EssilorLuxottica products.

**vi.    Essilor Instruments**

129.   Essilor Instruments is "a leader in the development of modern solutions and technologies for eye care professionals throughout the world."[49]

130.   Essilor Instruments describes itself as the number one worldwide in finishing and measuring devices with more than 50,000 devices and 1,200 "collaborators" around the world.

131.   Essilor Instruments includes multiple options, including consultation and diagnostic equipment, refraction and prescription, lens selection and fitting, edging and mounting, and connectivity and productivity.

---

[48] *Supra* note 46.

[49] What We Do And Who We Are, Essilor Instruments (last visited Jan. 23, 2024), https://www.essilorinstrumentsusa.com/about-us/.

132.    Through these additional instrument systems, EssilorLuxottica is further engrained in the entire eyewear chain, including through the patient prescription process, lens selection, and even practice management.

### vii.    Lens Processing

133.    In addition to owning most of the major corrective lens brands, EssilorLuxottica also controls lens processing in the United States.

134.    EssilorLuxottica's dominance continues as, consistent with its overall business strategy, EssilorLuxottica continues to acquire other, previously independent lens processing facilities, including the below examples:

    A.  Walman Optical – March 2022.[50]

    B.  Expert Optics – October 2018[51]

    C.  U.S. Optical – July 2016.[52]

---

[50]    EssilorLuxottica Closes Acquisition of Walman Optical, https://www.essilorluxottica.com/cap/content/104460/.

[51] Essilor of America Acquires Expert Optics, Vision Monday (last visited Jan. 23, 2024), https://www.visionmonday.com/latest-news/article/essilor-of-america-acquires-expert-optics.

[52]    https://www.visionmonday.com/latest-news/article/essilor-of-america-acquires-us-optical-second-largest-independent-lab-1/. At the time, this was the second largest independent optical lab in the United States.

135.    By obtaining control over a majority of the lens processing capacity in the United States, EssilorLuxottica has obtained further domination over the eyewear market and the ability to charge supra-competitive prices.

136.    With its market power spanning so many different aspects of the Branded Eyewear Market, EssilorLuxottica has great power and control over the manufacturing, distribution, and sale of Eyewear.

137.    With EssilorLuxottica's control, the company and its affiliates and subsidiaries have been able to charge supra-competitive prices for its Eyewear with little to no competition from outside competitors.

138.    While prices have increased for consumers, EssilorLuxottica's margins have also increased, which is a classic sign of reduced competition and market power.[53]

## III.    Horizontal Agreements

### A. Licensing Agreements

139.    In addition to EssilorLuxottica's extensive manufacturing and retail network, as well as producing its Proprietary Brands, the company produces and

---

[53] David Balto, *Get Ready to Pay When One Company Dominates the Eyeglass Market*, The Hill (Nov. 28, 2017), https://thehill.com/opinion/healthcare/362146-get-ready-to-pay-when-one-company-dominates-the-eyeglass-market/.

distributes Eyewear for Fashion House Brands.[54] Through long-term Exclusive Licensing Agreements, EssilorLuxottica receives exclusive rights to design, manufacture, and distribute Eyewear for many luxury Fashion House Brands. In return, the Fashion House Brands receive royalties on the sale of their Branded Eyewear. The length and exclusivity of these agreements prevent any actual or potential rivals from acquiring rights to produce or distribute for these Fashion House Brands.

140.   Throughout the years, EssilorLuxottica has entered into Exclusive Licensing Agreements with Fashion Houses related to their Branded Eyewear, these agreements include but are not limited to:

    A.  1988: Giorgio Armani;

    B.  1992: Brooks Brothers;

    C.  1997: Bulgari;

    D.  1999: Chanel;

    E.  2003: Gruppo Prada and Versace;

    F.  2005: Donna Karan Int.;

    G.  2006: Dolce & Gabbana and Burberry;

---

[54] A Fascinating History, *supra* note 24.

H.  2007: Paul Smith Spectacles and Ralph Lauren Corp.;

I.   2008: Tiffany;

J.   2009: Tory Burch;

K.  2012: Coach;

L.  2013: Gruppo Armani and Starck Eyes;

M. 2015: Michael Kors;

N.  2017: Valentino;[55]

O.  2022: Swarovski;[56] and

P.  2023: Eastman Kodak Company and Jimmy Choo Eyewear.

Many of these Exclusive Licensing Agreements have been maintained, and lengthy renewal agreements are often signed. These Exclusive Licensing Agreements often range from 10 – 15 years in length, which acts as a barrier to competitors or entrants into the market, as they cannot even attempt to contract with these companies to distribute their Branded Eyewear due to EssilorLuxottica's continued control over the production.

---

[55] *See* note 24.

[56] *See* note 28.

## B. Sales Agreements

141.   In addition to EssilorLuxottica's Proprietary Brands, its own Branded Eyewear, and the products Defendants have access to under Licensing Agreements, EssilorLuxottica also sells products from other manufacturers, owners, or license holders ("Competing Eyewear Entities") in its retail outlets.[57]

142.   The Competing Eyewear Entities include, but are not limited to, such well-known brands such as Balenciaga, Chloe, Gucci, Maui Jim, Saint Laurant, Tom Ford, Dior, LVMH, Thelios, Celine and Fendi.

143.   These Competing Eyewear Entities would be considered horizontal competitors with EssilorLuxottica and under the agreements that the parties enter into, EssilorLuxottica controls the sale and sales price of the Competing Eyewear Entities' Eyewear sold in EssilorLuxottica stores.

144.   Because EssilorLuxottica controls the prices of the Competing Eyewear Entities' products in its retail stores, as well as the prices of Defendants'

---

[57]   Women's Sunglasses, Sunglass Hut (last visited Jan. 23, 2024), https://www.sunglasshut.com/us/womens-sunglasses?_gl=1*1elk2jv*_up*MQ..&gclid=EAIaIQobChMItfnCz4f0gwMVtgh7B x0N7QbjEAAYASAAEgKFMPD_BwE&gclsrc=aw.ds.

Proprietary Brands, EssilorLuxottica has completely eliminated the possibility for competition, allowing it to maintain its supra-competitive prices.

### C. Most Favored Nation Agreements

145.   EssilorLuxottica distributes its Proprietary and Branded Eyewear brands through Exclusive Licensing Agreements to third parties for resale ("Third Party Sellers") under limited terms and conditions. The agreements include price restrictions, such as most favored nation clauses, which prevent Third Party Sellers from discounting the brands. The most favored nation agreements prevent price competition and allow prices to continue to remain astronomical.

146.   Most favored nation agreements are common within monopolies as they allow the monopoly to lock down the market and block competition, by preventing potential competitors from undercutting them on price.

147.   The Exclusive Licensing Agreements, Sale Agreements, and Most Favored Nation Agreements act to eliminate competition and allow EssilorLuxottica to set unfair and supra-competitive prices.

148.   With EssilorLuxottica's control over the pricing of its Proprietary Brands and Branded Eyewear produced under its Exclusive Licensing Agreements, there

is no competition, allowing the company to set supra-competitive prices without any fear of being undercut.

149.    EssilorLuxottica does not inform consumers that EssilorLuxottica is an exclusive licensee, manufacturer, and/or distributor of most of the Eyewear it sells or that the company has entered into a number of agreements that allow EssilorLuxottica to control pricing, effectively eliminating competition in the Branded Eyewear Market.

## IV.    Vertical Restraints

150.    EssilorLuxottica maintains a wholly owned subsidiary, EyeMed, that is one of the largest vision benefits companies in the United States.

151.    EyeMed claims to be America's fastest growing vision benefits company.[58]

152.    EyeMed touts its "independent" provider network, which includes LensCrafters, Pearle Vision, and Target Optical, all of which are subsidiaries of EssilorLuxottica.[59]

---

[58] EyeMed, *Vision benefits for every pair of eyes*, EyeMed (Dec. 4, 2023), https://www.eyemed.com/en-us.

[59] *Id.*

153.   On information and belief, EyeMed requires or incentivizes its in-network providers to market or sell EssilorLuxottica's Eyewear to consumers.

154.   EyeMed direct markets EssilorLuxottica's Eyewear to consumers.

155.   Through EssilorLuxottica's control of the vision benefits company, EyeMed, and EssilorLuxottica's ability to ensure its own retailers, who carry EssilorLuxottica's Proprietary Brands, EssilorLuxottica is able to steer consumers into purchasing its products without consumers knowing about the lack of choice and level of manipulation.

156.   EssilorLuxottica also owns Vision Source, which Essilor acquired in 2015.[60] Vision Source is a subsidiary that contracts with "independent" eyecare professionals for the sale of EssilorLuxottica's Proprietary brands and licensed brands.

157.   Vision Source's network treats approximately 16 million patients annually, collectively making it the largest optical retailer in the United States.

---

[60] *See* Our History, EssilorLuxottica (last visited Jan. 23, 2024), https://www.essilorluxottica.com/en/group/history/; *see also* Essilor Agrees to Acquire Vision Source to Further Support Independent Eye Care Professionals, Vision Source (last visited Jan. 23, 2024), https://visionsource.com/about/news-media/press-releases/essilor-agrees-to-acquire-vision-source-to-further-support-independent-eye-care-professionals/.

158.   Many Vision Source franchises fail to inform customers that they are associated with Vision Source or EssilorLuxottica, as the franchises hold themselves out as independent eyecare professionals. This assertion would give customers the impression that the eyecare provider is selecting which Eyewear is sold in their store and how much to price it for, but this is unfortunately not the reality and EssilorLuxottica continues to be able to manipulate the prices of Eyewear.

## V. History of Anticompetitive Conduct

159.   EssilorLuxottica is all too familiar with anticompetitive conduct.

160.   On July 22, 2021, the French Competition Authority found that Luxottica was limiting the pricing freedom of its retailers. EssilorLuxottica was releasing "recommended" pricing to its retailers and prohibiting discounts or special offers. If any of the opticians failed to cooperate with the "recommended" pricing, the opticians were subject to retaliation such as delaying or suspending deliveries to their stores. These measures left both the opticians and their customers vulnerable and created significant damage to the economy. In addition to the "recommended" pricing, EssilorLuxottica was prohibiting online sales of sunglasses and glasses frames by opticians. This prevented opticians and

consumers from accessing a sales channel that generally provides competitive prices.[61]

161.    EssilorLuxottica was fined €125,174,000 for price fixing and reducing competition.[62]

162.    The following year on October 6, 2022, the French Competition Authority once again completed an investigation into EssilorLuxottica and found EssilorLuxottica guilty of unfair practices. This time, the French Competition Authority found that Essilor and eventually EssilorLuxottica was implementing discriminatory practices to hinder the development of the online distribution channel for Eyewear. EssilorLuxottica accomplished this through prohibiting online retailers from using Essilor's trademarks and logos and from communicating the origin of the lenses. EssilorLuxottica also implemented warranty limitations to online sales operators, essentially requiring the retailer to

---

[61] Bertille Gauthier, Several eyewear brands and manufacturers fined for imposing selling prices and restrictions on online sales, Autorité de la concurrence (July 23, 2021), https://www.autoritedelaconcurrence.fr/en/communiques-de-presse/several-eyewear-brands-and-manufacturers-fined-imposing-selling-prices-and.

[62] Id.

replace lenses if an issue occurred. Through their discriminatory sales practices, they kept the prices of glasses high and limited consumer choice in France.[63]

163.   Due to Defendants' discriminatory trade practices, Essilor and EssilorLuxottica were fined €81,067,400.

164.   EssilorLuxottica has also recently faced investigations and eventual lawsuits in the United States.

165.   In May 2016, a Relator filed a *qui tam* action against Essilor Laboratories of America, Inc. and others alleging they violated the Insurance Frauds Prevention Act of the California Insurance Code. In April 2021, the California Department of Insurance intervened and filed a superseding complaint.

166.   The suit alleged that Essilor provided illegal kickbacks to eye care providers by paying providers thousands of dollars up front if they promised to send business to Essilor. The suit also claimed that Essilor was providing more

---

[63] Maxene Lepinoy, Optical lenses sector: the Autorité de la concurrence hands out fines worth 81 067 400 euros to Essilor International SAS and its parent company EssilorLuxottica SA for discriminatory trade practices, Autorité de la concurrence (Nov. 8, 2022), https://www.autoritedelaconcurrence.fr/en/press-release/optical-lenses-sector-autorite-de-la-concurrence-hands-out-fines-worth-81-067-400.

kickbacks with their "PracticeBuilder" program that gave providers cash payments for using Essilor lenses and laboratory services.[64]

167.    The kickbacks that Essilor was providing to eye care providers violated the Insurance Frauds Prevention Act because the incentives influenced medical decision making, taking away a patient's choice and driving them to pay for more expensive goods and services.[65]

168.    The parties settled out of court, with Essilor agreeing to pay $23.8 million.

169.    This was not the only time that Essilor faced legal action for its alleged kickbacks to eye care providers.

170.    The U.S. Department of Justice alleged that Essilor violated the False Claims Act by causing claims to be submitted to both Medicare and Medicaid that were a result of violations of the Anti-Kickback Statute.[66]

---

[64] Department of Insurance investigation leads to $23.8 million settlement with Essilor Laboratories of America, Inc., California Department of Insurance (Dec. 5, 2022),                                      https://www.insurance.ca.gov/0400-news/0100-press-releases/2022/release084-2002.cfm.

[65] Id.

[66] Office of Public Affairs, Essilor Agrees to Pay $16.4 Million to Resolve Alleged False Claims Act Liability for Paying Kickbacks, Office of Public Affairs U.S. Department of Justice (August 23, 2022), https://www.justice.gov/opa/pr/essilor-

171.   The United States alleged that Essilor knowingly paid remuneration to eye care providers to induce the providers to order and purchase Essilor products for their patients, including patients receiving Medicare or Medicaid.

172.   Similar to the California lawsuit, the purpose of the Anti-Kickback Statute was to prevent doctors from making medical decisions for their patients based on financial incentives, rather than their patients' best interests.

173.   Essilor again chose to settle, agreeing to pay $16.4 million to resolve the allegations in 2022.[67]

### ANTICOMPETITIVE EFFECTS ON CONSUMERS

174.   EssilorLuxottica's anticompetitive acts, as described above, have significantly impacted competition in the Branded Eyewear Market and have resulted in Plaintiff and members of the Classes paying overly inflated prices for all EssilorLuxottica brands, Licensed Fashion House Brands, and Competing Eyewear Entities brands.

---

agrees-pay-164-million-resolve-alleged-false-claims-act-liability-paying-kickbacks.

[67] *Id.*

175.   Plaintiff and the Classes paid these overcharges to their eyecare professionals and/or non-EssilorLuxottica owned retail or online outlets.

176.   With little to no retail price competition, EssilorLuxottica has been able to coordinate and maintain retail pricing floors at supra-competitive levels, resulting in supra-competitive pricing of all Branded Eyewear in the United States.

177.   Some estimates indicate that EssilorLuxottica has marked up the retail price of its Proprietary Brands and Licensed Fashion House Brands by at least 1,000 percent, if not more.[68] Despite the fact that industry professionals note that good frames can be made anywhere from $4 - $15,[69] EssilorLuxottica is able to sell frames anywhere from $200 – $1,000+. Moreover, EssilorLuxottica is able to sell lenses that cost as little as $1.25 a pair to make for more than $200.[70]

178.   EssilorLuxottica is able to accomplish these markups through its Exclusive Licensing Agreements, sales agreements with competitors, and third-party distribution agreements because these agreements essentially allow

---

[68] Chavie Lieber, Glasses can have a markup of 1,000%. Two former LensCrafters executives revealed why, Vox (Mar. 6, 2019), https://www.vox.com/the-goods/2019/3/6/18253555/eyeglasses-cost-lenscrafters-essilor-luxottica.

[69] *Id.*

[70] *Id.*

EssilorLuxottica to determine the retail price floors. EssilorLuxottica is able to accomplish its lens markups through its dominance of the lens market, capturing the majority of lens processing, and incentivizing eyecare practitioners to prescribe EssilorLuxottica lenses.

179.   Agreements often have price requirements, as was seen in the French lawsuit[71] and do not allow retailers to discount the product at all. Therefore, EssilorLuxottica effectively eliminates all forms of competition, allowing EssilorLuxottica to be solely responsible for pricing.

180.   It is clear that EssilorLuxottica has harmed competition by limiting competitors' ability to compete with EssilorLuxottica for the retail price of Branded Eyewear through the use of Exclusive Licensing Agreements, sales agreements, and distribution agreements and limited competitors' ability to compete with EssilorLuxottica for the price of corrective lenses.

181.   Additionally,   through   its   anticompetitive   Exclusive   Licensing Agreements, EssilorLuxottica prevents the Fashion Houses from wholesaling their own Branded Eyewear to third party retailers who could compete with

---

[71] Gauthier, *supra* note 60.

EssilorLuxottica, therefore foreclosing the Branded Eyewear Market significantly to potential competitors.

182.   Consumer choice has also been limited by this conduct because while there are many brands, the choice between these brands is an illusion due to EssilorLuxottica's intricate web of agreements that all lead back to EssilorLuxottica and its products.

183.   The Scheme has eliminated and impaired rivals in the Eyewear Market and blocked the entry and growth of other potential competitors. As a result, the number, size, and significance of other eyewear brands, lens manufacturers, and lens processors has been reduced.

184.   There are no legitimate procompetitive justifications or efficiencies for the conduct alleged herein. Any arguably procompetitive justifications or efficiencies are far outweighed by the anticompetitive effects alleged herein.

185.   Due to EssilorLuxottica's actions, it has unlawfully eliminated competition in the Eyewear Market and coordinated its efforts to maintain the retail price of Branded Eyewear at supra-competitive levels.

**FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS**

186.   Plaintiff and members of the Classes had no knowledge of Defendants' unlawful self-concealing Scheme and could not have discovered the Scheme and conspiracy through reasonable due diligence more than four years prior to filing this complaint.

187.   As previously mentioned, Defendants' Scheme was self-concealing and Defendants employed deceptive practices and techniques of secrecy to avoid detection, Defendants wrongfully and affirmatively concealed the existence of their continuing conspiracy from Plaintiff and the public by concealing the nature of the exclusive agreements, sales agreements, and distribution agreements between EssilorLuxottica, the Fashion Houses, and third-party sellers.

188.   This comes as no surprise as EssilorLuxottica has a history of concealing unlawful conduct. For example, during the French Competition Authority revealed, the Commercial Director of Luxottica France was directing an employee, Philippe, to "contact the optician on this point ONLY BY TELEPHONE [,]" and

then to "<u>PLEASE DELETE ALL YOUR EMAILS ON THIS SUBJECT IMMEDIATELY.</u>"[72]

189.   As a result of Defendant, EssilorLuxottica's fraudulent concealment, all applicable statutes of limitation affecting the Plaintiff's and the Classes' claims have been tolled.

## CAUSES OF ACTION

### COUNT I: INJUNCTIVE RELIEF
### FOR VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 2
### (ON BEHALF OF THE NATIONWIDE INJUNCTIVE RELIEF CLASSES)

190.   Plaintiff incorporates each prior paragraph as if set forth herein.

191.   The Relevant Market is the Branded Eyewear Market.

192.   At all relevant times, Defendants controlled the Eyewear Market and prices in the Eyewear Market. Defendants, however, are horizontal competitors with the Fashion House Licensed Brands and Competing Eyewear Entities.

193.   During the conspiracy, the exact dates being unknown to Plaintiff, Defendants engaged in a continuing agreement, understanding and conspiracy in an unreasonable and unlawful restraint of trade to artificially fix, depress,

---

[72] French Competition Authority Decision 21-D-20, *in toto* (July 22, 2021) ("FCA 21-D-20"), (emphasis in original) (Machine translated by Google).

suppress, or stabilize the price of Branded Eyewear in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants' conspiracy is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

194.   Defendants' price fixing conspiracy deprived market participants in the relevant market of the benefit of price competition.

195.   Defendants' conspiracy and the resulting impact on Branded Eyewear prices purchased by consumers occurred in and affected U.S. interstate commerce.

196.   Moreover, Defendants acted in concert and have obtained, enhanced, and maintained monopoly power in the Relevant Market through the Scheme alleged herein, which conduct is continuing. Defendants have substantially foreclosed competition and have abused and continue to abuse their power to maintain and enhance market dominance in the Relevant Market through their Scheme, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

197.   Defendants have engaged in a continuing Scheme with respect to the Relevant Market in an unreasonable restraint of trade and commerce, with the purpose and effect of acquiring, enhancing, and maintaining monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

198.    As a material and proximate result of Defendants' unlawful conduct, Plaintiff suffered injury to Plaintiff's property. These injuries include, but were not limited to, paying supra-competitive prices for Branded Eyewear. Plaintiff was also deprived of the benefits of free and open competition.

199.    Plaintiff is threatened with future injury to Plaintiff's property unless Defendants are enjoined from further unlawful conduct.

200.    Plaintiff accordingly seeks equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT II: VIOLATION OF STATE ANTITRUST LAW
### (ON BEHALF OF STATE LAW CLASS)

201.    Plaintiff incorporates each prior paragraph as if set forth herein.

202.    By engaging in the foregoing conduct, Defendants wrongfully engaged in conduct, a combination, and/or conspiracy in restraint of trade in violation of the following state antitrust laws, with respect to purchases in the below respective States and/or purchases made by residents of the below States:

a.       Ala. Code §§ 8-10-1, et seq., and Ala. Code § 6-5-60(a)

b.       Ariz. Rev. Stat. §§ 44-1402, et seq.

c.       Ark. Code Ann. §§ 4-75-309, et seq.

d.       Cal. Bus. and Prof. Code §§ 16720, et seq.

e.       Conn. Gen. Stat. Ann. §§ 35-26, et seq.

f.       D.C. Code §§ 28-4502, et seq.

g.       Haw. Rev. Stat §§ 480-1, et seq.

h.       740 Ill. Comp. Stat. 10/3, et seq.

i.       Iowa Code §§ 553.4, et seq.

j.       Kan. Stat. Ann. §§ 50-101, et seq. and 50-158, et seq.

k.       Me. Stat. tit. 10 §§ 1101, et seq.

l.       Md. Code, Com Law, §§ 11-204, et seq.

m.       Mich. Comp. Laws §§ 445.772, et seq.

n.       Minn. Stat. §§ 325D.49, et seq.

o.       Miss. Code Ann. §§ 75-21-3, et seq.

p.       Neb. Rev. Stat. §§ 59-801, et seq.

q.       Nev. Rev. Stat. §§ 598A.060, et seq.

r.       N.H. Rev. Stat. Ann. §§ 356:2, et seq.

s.      N.M. Stat. Ann. §§ 57-1-1, et seq.

t.      N.Y. Gen. Bus. Law §§ 340, et seq.

u.      N.C. Gen. Stat. §§ 75-1, et seq.

v.      N.D. Cent. Code §§ 51-08.1-02, et seq.

w.      Or. Rev. Stat. §§ 646.725, et seq.

x.      R.I. Gen. Laws §§ 6-36-4, et seq.

y.      S.D. Codified Laws §§ 37-1-3.1, et seq.

z.      Tenn. Code Ann. §§ 47-25-101, et seq.

aa.     Utah Code Ann. §§ 76-10-3104, et seq.

bb.     Vt. Stat. Ann. Tit. 9 §§ 2453, et seq.

cc.     W. Va. Code §§ 47-18-1, et seq.

dd.     Wis. Stat. §§ 133.03, et seq.

203.    Plaintiff and members of the State Law Class have been injured by Defendants' antitrust violations alleged herein, including paying supra-competitive prices for their Branded Eyewear. But for such conduct, Plaintiffs would have purchased their Branded Eyewear for less in a properly functioning, competitive market. These injuries are of the type that the foregoing laws are

intended to prevent, and flow from that which makes Defendants' conduct unlawful.

204.    Plaintiff and the State Law Class seeks all damages permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

### COUNT III: VIOLATION OF STATE CONSUMER PROTECTION LAW
### (ON BEHALF OF STATE LAW CLASS)

205.    Plaintiff incorporates each prior paragraph as if set forth herein.

206.    By engaging in the unfair and unlawful conduct alleged in this Complaint and with respect to purchases in the below respective States and/or purchases made by residents of the below States, Defendants violated the following state consumer protection laws:

a.      Ariz. Rev. Stat. Ann. §§ 44-1521, et seq.

b.      Cal. Bus. & Prof. Code §§ 17200, et seq.

c.      Colo. Rev. Stat. §§ 6-1-101, et seq.

d.      Fla. Stat. §§ 501.201, et seq.

e.      815 Ill. Comp. Stat. 505/1, et seq.

f.      Nev. Rev Stat. Ann. §§ 598.0903, et seq.

g.      N.M. Stat. Ann. §§ 57-12-1, et seq.

h.      N.Y. Gen. Bus. Law §§, et seq.

i.      N.C. Gen. Stat. §§ 75-1.1, et seq.

j.      Or. Rev. Stat. §§646.605, et seq.

k.     Tenn. Code Ann. §§ 47-18-101, et seq.

l.      Wis. Stat. § 100.20.

207.   On behalf of themselves and the State Law Class, Plaintiff seeks all appropriate relief provided for under the above statutes.

### PRAYER FOR RELIEF

208.   Plaintiff prays for the following relief:

A.  A determination that this action may be maintained as a class action under Federal Rules of Civil Procedure 23, appoint Plaintiff as Class Representative(s), and appoint Plaintiff's counsel of record as Class Counsel.

B.  Permanent injunctive relief invalidating EssilorLuxottica's exclusive licensing agreements with the Fashion Houses.

C. Permanent injunctive relief invalidating all price coordination or price delegation clauses contained in EssilorLuxottica's sales agreements with Competing Eyewear Entities and distribution agreements with third party sellers.

D.  Damages under the relevant state antitrust and/or consumer protection statutes for Defendants' wrongful conduct as alleged herein.

E.  Plaintiff's and the Class's costs, expenses, and reasonable attorneys' fees.

F.  Such other relief in equity or at law as this Court may deem just and proper.

### DEMAND FOR A JURY TRIAL

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

**BASSFORD REMELE**
*A Professional Association*

Dated: February 6, 2024          By: /s/ *Casey D. Marshall*
Daniel R. Olson (#0389235)
Jeffrey D. Klobucar (#0389368)
Casey D. Marshall (#0395512)
Aram V. Desteian (#0396021)
100 South Fifth Street, Suite 1500
Minneapolis, MN  55402
Telephone: (612) 333-3000
Facsimile:  (612) 333-8829
Email: dolson@bassford.com
         jklobucar@bassford.com
         cmarshall@bassford.com
         adesteian@bassford.com

-and-

**PAUL LLP**

Dated: February 6, 2024         By:  /s/ *Richard M. Paul, III*

Richard M. Paul, III
(*pro hac vice application to be submitted*)
Laura C. Fellows
(*pro hac vice application to be submitted*)
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Email: Rick@PaulLLP.com
          Laura@PaulLLP.com

*COUNSEL FOR PLAINTIFF AND THE PROPOSED CLASSES*